# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00371-CR

**Jim Jack Thompson, III, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
### NO. 13-0520-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Jim Jack Thompson, III, was arrested and indicted for the offense of burglary of a habitation. *See* Tex. Penal Code § 30.02(a) (setting out elements of offense), (c) (specifying that offense is second-degree felony). The alleged victim and owner of the home at issue was Shannon Francis. At the end of the guilt or innocence phase of the trial, the jury determined that Thompson was guilty of the alleged offense. The indictment also contained an enhancement paragraph asserting that Thompson had previously been convicted of burglary of a habitation, and Thompson entered a plea of true to the enhancement allegation during the punishment phase. *See id.* § 12.42(b) (elevating punishment range for second-degree felony to that of first-degree felony if defendant has been previously convicted of felony offense). At the end of the punishment phase, the jury determined that Thompson should be imprisoned for 60 years, *see id.* § 12.32 (listing permissible punishment range for first-degree felony), and the district court entered its judgment

in accordance with the jury's determination. On appeal, Thompson argues that the evidence is legally insufficient to support the district court's judgment. We will affirm the district court's judgment of conviction.

**DISCUSSION**

In his sole issue on appeal, Thompson argues that the evidence is legally insufficient to support his conviction for burglary.

An individual commits the offense of burglary if "without the effective consent of the owner," he "enters a . . . habitation and commits or attempts to commit a felony, theft, or an assault." Tex. Penal Code § 30.02(a)(3). Further, the Code specifies that "'[c]onsent' means assent in fact, whether express or apparent," *id.* § 1.07(a)(11), and "[t]he testimony of an owner that she did not give permission to enter the habitation is sufficient to establish the absence of effective consent" regardless of whether the door was unlocked or open. *Lee v. State*, 442 S.W.3d 569, 580 (Tex. App.—San Antonio 2014, no pet.).

In this case, the State alleged that Thompson entered Francis's home with the "intent to commit the felony offense of robbery." A person commits robbery if, "in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another." Tex. Penal Code § 29.02(a). Bodily injury is defined as "physical pain, illness, or impairment of physical condition," *id.* § 1.07(a)(8), and a factfinder "may infer that a victim actually felt or suffered physical pain because people of common intelligence understand pain and some natural causes of it," *Wingfield v. State*, 282 S.W.3d 102, 105 (Tex. App.—Fort Worth 2009, pet. ref'd). Moreover, "'[i]n the course of committing theft' means

2

conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." Tex. Penal Code § 29.01(1); *see also Bustamante v. State*, 106 S.W.3d 738, 740-41 (Tex. Crim. App. 2003) (explaining that "an intent to steal may be inferred from circumstantial evidence"); *Russo v. State*, 228 S.W.3d 779, 794 (Tex. App.—Austin 2007, pet. ref'd) (noting that "[p]roof of a completed theft is not even required" for robbery conviction). In addition, "[a] person commits" theft "if he unlawfully appropriates property with intent to deprive the owner of property," and appropriation is unlawful if "it is without the owner's effective consent." Tex. Penal Code § 31.03(a), (b)(1). Further, the Penal Code specifies that an individual attempts to commit an offense if "with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." *Id.* § 15.01(a).

Under a legal-sufficiency standard of review, appellate courts view the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When performing this review, an appellate court must bear in mind that it is the factfinder's duty to weigh the evidence, to resolve conflicts in the testimony, and to make reasonable inferences "from basic facts to ultimate facts." *Id.*; *see also* Tex. Code Crim. Proc. art. 36.13 (explaining that "jury is the exclusive judge of the facts"). Moreover, appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Furthermore, appellate courts presume that conflicting inferences

3

were resolved in favor of the conviction and defer to that resolution. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In addition, courts must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

During the trial, the State introduced evidence concerning the offense at issue as well as criminal conduct occurring immediately prior to Thompson entering Francis's home. Regarding the conduct occurring just before the offense at issue, Melinda Cortez testified that she worked in a store near the subdivision where Francis's home is located, heard the door to the employee office open and close, and went to investigate. When describing that portion of the store, Cortez related that no one is "supposed to be back there without my knowledge." Moreover, she explained that on her way to the back of the store, she saw Thompson near the back office, that she asked Thompson if he had gone into the office, and that Thompson initially denied it but later admitted that he went to the office to look for a bathroom. In her testimony, Cortez stated that Thompson did not appear confused and "knew what he was doing." When describing what she observed in the back office, she explained that she saw her purse lying on the ground with the contents scattered about the floor. Next, Cortez related that she went back to look for Thompson after seeing her purse but that Thompson had left the store. Furthermore, Cortez recalled that she called the police, went outside to find Thompson, and saw Thompson get inside the cab of a truck in the parking lot, move from the cab to the back bed of the truck, jump out of the back of the truck, and run past her "down the sidewalk" into a nearby subdivision. Finally, Cortez explained that when she went back to the store, she discovered that her wallet had been taken.

4

After Cortez finished her testimony, Stevie Lamb was called to the stand to testify regarding what she witnessed when she was in the store that day. In her testimony, Lamb corroborated Cortez's testimony regarding the order of the events, particularly how Thompson ran out of the store and attempted to get into a truck in the parking lot, and characterized Thompson's behavior, including running out of the store, as "weird" and "not normal." Moreover, Lamb stated that before Thompson ran out of the store, she heard Thompson and Cortez speaking to one another, heard Thompson deny repeatedly that he went inside the back office, and heard Thompson later admit that he went back to the office because he thought it was a bathroom.

Regarding the offense at issue, the State called Francis and Officer Jerry Hallford to testify regarding their interactions with Thompson. In her testimony, Francis explained that when she came home for lunch, she walked into her house and noticed Thompson "laying on the floor of my bedroom." In her testimony, Francis emphasized that she never gave Thompson permission to enter her home and that she had never seen him before that day. When describing the situation, she said that she thought that it was odd that Thompson was lying on the floor and that he did not have a reaction to her coming in the house. Next, she testified that she asked Thompson who he was and that he told her that some friends of his had told him that he could "crash" at her home for a music festival that was going on. She also testified that he initially acted in a calm, soft-spoken manner and not in the way that she would have expected for someone who had committed a crime. In addition, she recalled that when she looked around the room, she noticed that one of her purses "was on the bed and that the contents had been dumped out."

Later in her testimony, Francis explained that at some point she realized that Thompson was in her home for improper reasons; that she backed out of her bedroom and went into the garage;

5

that Thompson started moving slowly, which "seemed odd"; that she pulled her cell phone out of her purse to call the police; that Thompson asked "to borrow" the cell phone, which she interpreted "as his attempt to get my phone away from me"; that she told the police that she needed help; and that Thompson followed her into the garage. When describing how she was holding her purse, Francis explained that "I was holding my purse on the crook of my right arm." Next, Francis stated that Thompson demanded her car keys, that he started shouting at her, and that he said, "I don't want anything else from you. I just want your car keys." Moreover, she testified that when she said no, "he attacked me, assaulted me." More specifically, she said that he grabbed her to get her purse, that they struggled, that the force of the struggle knocked her to the ground, and that she felt pain from where he grabbed her for several days.

Next, Francis explained that Thompson took her purse and dumped the contents onto the floor of the garage, that he grabbed her car keys, that he ran to and got in her car, that he could not get the car to start, that he ran back to her and asked for the car keys even though he already had them, that he grabbed her house keys from the floor and took them back to car, that he still was unable to start the car, that he came back and started yelling at her to start the car, that his "behavior was escalating," that she ran out into the street to yell for help, that she saw a police car driving slowly down the street, and that she got the police officer's attention by waiving her hands. In addition, Francis related that when the officer arrived at her house, Thompson took off running.[1]

---

[1] Before Francis testified, one of her neighbors, Tyra Daniels, was called to the stand. In her testimony, she explained that she lives near Francis and heard Francis screaming in her driveway and saw Thompson fumbling with a set of keys. When describing Thompson, she said that she thought that he might have been drunk but that when he ran by, "he ran past very alert."

After discussing the incident, Francis testified that she went back into her home with some police officers and that she noticed that a pillowcase of hers had been filled with her laptop, some money, and a watch. Moreover, she described how the back door of her house "had a bunch of cracks in it" from when Thompson entered her home. In addition, she explained that when she looked in her car, she noticed that her boyfriend's backpack was in the front passenger seat, that she spotted the backpack by Thompson's feet earlier when he was lying down in her bedroom, and that the backpack contained her camera as well as a video game console belonging to her boyfriend.

During her testimony, photos were admitted into evidence showing the injuries to her arm that she sustained when Thompson grabbed her purse, the injuries that she sustained when she was knocked to the ground, and the damage that was done to her back door when Thompson entered her house. In addition, a recording of the 911 call that Francis made was played for the jury. On the recording, Francis initially attempted to report that Thompson was in her house but that before she finished making that report, Thompson started demanding that she give him her keys. Moreover, a physical disturbance can be heard on the recording.

After Francis finished her testimony, Officer Hallford was called to the stand to discuss his observations when he arrived at Francis's home and saw Thompson in her car. In particular, he testified that after Francis said that Thompson was not supposed to be there, he asked Thompson what he was doing and that Thompson seemed nervous and responded, "I was trying to get something out of the car." When describing his initial assessment of Thompson, Officer Hallford testified that Thompson appeared to be "high." Next, Officer Hallford related that Thompson took off running, that he chased Thompson through the neighborhood, that Thompson ran to a nearby

7

store, that Thompson forced a driver out of his car in the parking lot, that Thompson drove off, and that other police officers eventually caught him. Furthermore, Officer Hallford recalled when the police caught him and arrested him, Thompson stated that he had made a mistake and deserved to be punished for it.

When presenting his case, Thompson called the following witnesses to the stand: his co-worker Jeremy Charske, his sister Sage Thompson, and his psychiatrist Dr. Robert Cantu. In his testimony, Charske explained that he works for Thompson's father and that on the morning of the offense, he noticed Thompson at the office "rapidly pacing back and forth" and rubbing his head, and Charske described the behavior as unusual. Moreover, Charske related that when he went to talk to Thompson, Thompson gave him a "blank stare" and did not respond to him, and Charske recalled that he called Thompson's father to tell him that something was "seriously wrong with" Thompson. Furthermore, Charske stated that by the time that Thompson's father arrived, Thompson had already left. In her testimony, Sage testified that on the morning of the offense, she was supposed to take Thompson to get his antidepressants but that Thompson left the office before she was ready to take him.

After Thompson's co-worker and sister finished testifying, Thompson called Dr. Cantu to the stand. When testifying regarding his prior interactions with Thompson, Dr. Cantu explained that approximately one year before the incident, Thompson's family called him to see if he would consider evaluating Thompson. Further, Dr. Cantu related that he saw Thompson once; that Thompson had been taking Effexor for several years; that Effexor is used to treat depression, anxiety, and other mental-health issues; that Thompson had run out of the medication; that Thompson stated that the

medicine had previously helped him with his depression, aggression, and "paranoid fear"; and that he gave Thompson a new prescription for the drug. Dr. Cantu also explained that after his initial consultation with Thompson, Thompson switched to a different mental-health provider.

Next, Dr. Cantu explained that he was contacted by Thompson's family again after the offense at issue and was asked to do another assessment of Thompson. In his testimony, Dr. Cantu stated that he had one session with Thompson that lasted approximately two hours. Regarding Thompson's mental health around the time of the offense, Dr. Cantu testified that Thompson's "decision-making was disturbed," that "his thinking was disorganized," that he was "very agitated," and that this behavior was likely caused by the fact that he stopped taking Effexor a few days before the offense. Moreover, he explained that some people who abruptly stop taking Effexor can have severe withdrawal and can become delusional. In addition, Dr. Cantu related that during his interview with Thompson, Thompson described feeling "electrical zaps" in his head and body, and Dr. Cantu explained that that symptom is a "unique complaint to people who are going through withdrawal from" antidepressants.

In addition, Dr. Cantu testified that he believed that Thompson's withdrawal had caused Thompson to be "hypomanic" or be in an "active agitated state with a lot of" disorganized thoughts and created "some persecutory delusions that something was out to get him" or "kill him." Moreover, Dr. Cantu testified that some of the strange behavior that Thompson displayed during these offenses, including lying on the floor, jumping in the back of a truck after being ordered out of the cab of the truck, telling Francis that some friends had told him that he could stay at her house, and being unable to start Francis's car, were consistent with disorganized thinking. Further, Dr. Cantu

9

related that Thompson's interactions with Francis were not indicative of an intent to harm anyone and were more consistent with a desire to get away from his delusions. Also, Dr. Cantu disagreed with the State's assertion that Thompson intentionally, knowingly, or recklessly caused bodily injury to Francis because he believed that Thompson did not have a sense of what was going to happen. Portions of a written statement by Thompson were read during Dr. Cantu's testimony, and in that statement Thompson mentioned that he went into the employee office at the store to find keys and get away from the people that were after him, described Cortez as "one of them," surmised that the driver of the truck "was not one of them," mentioned that he hoped that he could hide in the truck bed and that the driver would save him, explained that he tried to take things from Francis's home in order to trade them "for a ride to get away," discussed how he did not know Francis "from the enemy," and expressed how he asked Francis for her keys in order to get "away before the killers came."

Further, although Dr. Cantu couched his answers with the assertion that Thompson's actions were inspired by the delusions and by his desire to get away from the delusions, Dr. Cantu agreed that Thompson acted intentionally when he took Cortez's wallet, that it was possible that he denied having been in the back of the store in order to cover up his criminal behavior, that he intentionally entered Francis's home without her consent, that he stated that he "kicked down the first door that I came to," that he intended to take items from Francis's house, that he intentionally demanded that Francis give him her keys, and that he knew the behaviors were wrong. Finally, during his testimony, Dr. Cantu was asked whether Thompson intentionally, knowingly, or recklessly caused injury to Francis, and he answered, "I think I already said that I agreed that it was knowingly and intentionally. I just take issue with the . . . recklessness part because I think he wasn't in the state of mind he could have thought these things out."

10

On appeal, Thompson acknowledges that the evidence established that he entered Francis's home without her permission, but he insists that no rational jury could have determined that he "intentionally or knowingly made a non-consensual entry" into Francis's home. As support for this proposition, Thompson refers to the testimony from the various witnesses describing his behavior as odd, including testimony relating that Thompson was seen lying on the floor of Francis's home and that Thompson told Francis that his friends had given him permission to stay in the home, but primarily relies on the testimony of Dr. Cantu asserting that he was delusional due to his withdrawal from Effexor and opining that his odd behavior was consistent with withdrawal symptoms. Accordingly, Thompson contends that none of the evidence at trial suggested that he knew that he did not have permission to enter Francis's home.

As a preliminary matter, we note that the element requiring proof that an individual entered a habitation without the "effective consent of the owner," Tex. Penal Code § 30.02(a), can be established by evidence that the owner of the habitation did not give permission to enter his home, *Lee*, 442 S.W.3d at 580; *see also Salazar v. State*, 284 S.W.3d 874, 877-78 (Tex. Crim. App. 2009) (explaining that nature of habitation "*inherently* provides notice that entry is forbidden"). During the trial, Francis testified that she had never seen Thompson before finding him inside her bedroom, that she did not give him permission to enter her home, and that Thompson damaged her back door when he made his way into her house. Accordingly, the evidence is legally sufficient to establish that Thompson entered Francis's home without her effective consent.

Moreover, we do note that additional evidence was introduced indicating that Thomas was acting intentionally or knowingly when he entered Francis's home. *See* Tex. Penal Code § 6.03(a)

11

(explaining that person acts intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result"), (b) (providing that person acts knowingly "when he is aware that his conduct is reasonably certain to cause the result"). Even though some of the witnesses explained that Thompson appeared to be behaving strangely and even though Dr. Cantu testified that he believed that much of Thompson's behavior could be a result of "persecutory delusions" that Thompson was experiencing due to his withdrawal from his anti-depressants, *cf. Jackson v. State*, 160 S.W.3d 568, 575 (Tex. Crim. App. 2005) (explaining that "[t]here is simply no defense recognized by Texas law stating that, due to the defendant's mental illness, he did not have the requisite *mens rea* at the time of the offense because he does not have the capacity, or is absolutely incapable of ever forming that frame of mind"), Dr. Cantu also testified that Thompson knew that his criminal actions were wrong, that he intentionally entered Francis's home, that he intentionally tried to take things from Francis's home, and that he intentionally asked for the keys to Francis's car. Moreover, Cortez testified that Thompson appeared to know what he was doing when she interacted with him, and Francis explained that prior to Thompson demanding her keys, Thompson appeared calm. Similarly, both women testified that they had conversations with Thompson during the criminal episodes. In addition, evidence was introduced that Thompson had the wherewithal to enter a prohibited area of Cortez's store and take her wallet and to gather various valuable items from inside Francis's home and place them in a pillow case and a backpack. Further, none of the witnesses to Thompson's criminal behavior testified that Thompson communicated or indicated in any manner that he was suffering from the types of delusions described by Dr. Cantu and mentioned by Thompson in the letter that he sent to Dr. Cantu after he had been arrested. Finally, the jury heard

testimony regarding when Thompson was arrested and specifying that Thompson admitted that he knew that his conduct was wrong.

Accordingly, the jury could have reasonably inferred from the evidence summarized above that Thompson acted in an intentional and knowing manner when he entered Francis's home. *See id.* at 574 (Tex. Crim. App. 2005) (stating that when jury was making its determination, it was able to consider all of evidence presented, "determine the weight of the evidence, and choose whether or not Appellant possessed the requisite *mens rea* to commit this offense"). Given the evidence presented at trial and given our role in performing a sufficiency review, we would be unable to conclude that the jury's determination was not supported by legally-sufficient evidence. *See Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778.

In a related set of arguments, Thompson argues that "no rational jury could have found beyond a reasonable doubt that" Francis "was injured while [he] was in the course of committing theft." In particular, Thompson notes that although the evidence establishes that Francis suffered bodily injury when he "was apparently attempting to exercise non consensual control over her purse," the evidence does not establish that he intended to retain custody of the purse "permanently or for long enough to significantly destroy the value of [her] enjoyment of the property." On the contrary, Thompson notes that the evidence established that he "left the purse on the garage floor next to Francis."

As an initial matter, we note that although Thompson emphasizes the fact that he left Francis's purse on the ground after obtaining it from her, the evidence presented during trial established that Thompson obtained the purse in order to get Francis's car keys, which he ultimately

13

did, for the purpose of stealing Francis's car, which he attempted to do but was unable to because he could not figure out how to start her car. *See Sorrells v. State*, 343 S.W.3d 152, 157 (Tex. Crim. App. 2011) (noting that, in general, theft occurring right after assault will support inference that assault was intended to facilitate theft); *Cooper v. State*, 67 S.W.3d 221, 224 (Tex. Crim. App. 2002) (concluding that evidence was sufficient to support that assault was committed in course of committing theft even though defendant alleged that he was hallucinating when he hit his uncle and then took his uncle's truck). Moreover, when Thompson demanded the keys and obtained them after dumping the contents of Francis's purse on the garage floor, Thompson was attempting to leave with a backpack filled with items that he had taken from inside Francis's home, and he placed the backpack and its contents in Francis's car when he attempted to take the car. Furthermore, Francis sustained the injuries at issue when Thompson grabbed her to get the keys to her car from her purse. Accordingly, even assuming that the jury could not have reasonably determined that he intended to retain possession of the purse, the evidence presented during trial established that there were other items belonging to Francis that Thompson intended to steal, and the jury could reasonably have determined that Francis was injured while Thompson was in the course of committing theft of those objects.

Moreover, to the extent that Thompson's argument on appeal can be construed as asserting that Thompson did not obtain possession of any item belonging to Francis to the degree needed to qualify as a theft, we note that the State was not required to prove actual deprivation and was instead only required to show that Thompson intended to deprive Francis of her property. *See* Tex. Penal Code § 31.03(a); *see also Rowland v. State*, 744 S.W.2d 610, 612 (Tex. Crim. App. 1988)

14

(providing that "[w]hile evidence of actual deprivation may be evidence of intent to deprive, other evidence may also indicate whether intent to deprive exists"). Furthermore, although the requisite intent "must exist at the time of the taking," it "can be inferred from the surrounding circumstances." *Mattiza v. State*, 801 S.W.2d 195, 197 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd); *see McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989) (stating that intent can be inferred from conduct). Moreover, "[t]he fact that the deprivation later became temporary does not automatically mean that there was no intent to deprive permanently or for so long as to satisfy the statutory definition." *See Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981); *see also Rowland*, 744 S.W.2d at 612-13 (explaining that although vehicle was eventually returned to owner, defendant was still guilty of theft because, among other reasons, he was not individual who "returned the truck"); *Brown v. State*, No. 11-01-00334-CR, 2002 WL 32344903, at *3 (Tex. App.—Eastland Aug. 15, 2002, no pet.) (not designated for publication) (stating that jury could rationally have determined that defendant intended to deprive owner when he took truck to evade police and abandoned it after wrecking it).

In this case, the evidence demonstrated that after Thompson entered Francis's home without her permission, he gathered up some of her belongings in a pillow case and in a backpack and that after Francis arrived home, he demanded the keys to Francis's car, placed the backpack in her car, and attempted to drive the car away. Moreover, the evidence established that Thompson did not succeed in his effort to take Francis's car because he could not figure out how to start her car and because the police arrived on the scene. Furthermore, in the portion of the letter that Thompson wrote to Dr. Cantu that was read during Dr. Cantu's testimony, Thompson explained that he intended

15

to sell the items that he took from Francis's home. In addition, evidence was presented establishing that just prior to his arrival at Francis's home, Thompson had engaged in another criminal episode in which he went into a prohibited portion of a store and stole the wallet belonging to Cortez.

Given the evidence summarized above and the reasonable inferences that the jury was free to make from the evidence, we conclude that the evidence is legally sufficient to show that Thompson intended to deprive Francis of her property and, accordingly, that Francis suffered bodily injury during the commission of a theft.

In his final set of arguments in this issue, Thompson argues that the evidence is legally insufficient because no "rational jury could have found beyond a reasonable doubt that [Thompson] intentionally, knowingly, or recklessly caused bodily injury to . . . Francis."[2] *See* Tex. Penal Code § 6.03(a)-(c) (setting out when person acts intentionally, knowingly, or recklessly); *see also Garfias v. State*, 424 S.W.3d 54, 60-61 (Tex. Crim. App. 2014) (explaining that "an assaultive offense causing bodily injury is a result-oriented offense," meaning that focus is "on the actual harm inflicted"). On the contrary, Thompson insists that, at most, the evidence showed that he was criminally negligent regarding whether Francis would be injured. *See* Tex. Penal Code § 6.03(d) (setting out mental state for criminal negligence). As support for this proposition, Thompson argues

---

[2] Although Thompson does not assert in this set of arguments that the jury could not have reasonably determined that he acted intentionally, knowingly, or recklessly in light of the testimony from Dr. Cantu and from the other witnesses who described his behavior as strange, we note, as described previously, that the jury could have inferred from all of the evidence presented that Thompson was behaving in an intentional, knowing, or reckless manner. *Cf. Jackson v. State*, 160 S.W.3d 568, 574 (Tex. Crim. App. 2005).

16

that the physical struggle was brief and occurred when he tried to take Francis's purse, that her injuries were minor, and that he made no verbal threats.[3]

As described previously, Francis testified that her purse was on her arm, that Thompson ordered her to give him her car keys, that she refused, that he "attacked her," that he grabbed her to get the purse, that the two of them struggled for the purse, that she was knocked to the ground because of the struggle, that she was injured in the struggle, and that she felt pain from her injuries for several days later. Moreover, evidence was introduced documenting the injuries to her arm and to her leg. From this evidence, the jury could reasonably have inferred that Francis's injuries were the types of injuries that a person who is knocked down is likely to suffer and that Thompson "was aware that his conduct (pulling on [Francis]'s purse with sufficient force to knock her down) was reasonably certain to cause [Francis] bodily injury." *See Smith v. State*, No. 12-11-00241-CR, 2012 Tex. App. LEXIS 7753, at *8 (Tex. App.—Tyler Sept. 12, 2012, no pet.) (mem. op., not designated for publication). Accordingly, the evidence is sufficient to establish that Thompson acted knowingly. *See* Tex. Penal Code § 6.03(b); *Smith*, 2012 Tex. App. LEXIS 7753, at *8; *see also Cano v. State*, 614 S.W.2d 578, 578-79 (Tex. Crim. App. 1981) (concluding that evidence was sufficient to support conviction of robbery for knowingly or intentionally causing bodily injury to complainant where defendant pushed complainant, causing her to fall onto pavement, while grabbing complainant's purse); *Lewis v. State*, 530 S.W.2d 117, 118 (Tex. Crim. App. 1975)

---

[3] When describing what type of conduct constitutes reckless behavior, Thompson heavily relies on cases involving the discharge of a firearm, *see Mendez v. State*, 575 S.W.2d 36 (Tex. Crim. App. 1979), and on cases in which a police officer has been injured when a suspect resists arrest, *see Gumpert v. State*, 48 S.W.3d 450 (Tex. App.—Texarkana 2001, pet. denied). However, we are not persuaded that either line of cases has any bearing on the facts present in this case.

(rejecting appellant's assertion that greater injuries than those actually suffered were necessary to elevate mere "purse snatching" to robbery); *Crawford v. State*, No. 10-10-00003-CR, 2011 Tex. App. LEXIS 8743, at *3-6 (Tex. App.—Waco Oct. 26, 2011, no pet.) (mem. op., not designated for publication) (determining that evidence was legally sufficient to support robbery conviction even though defendant did not threaten victim where victim testified that purse was on her arm, that defendant pulled purse, and that defendant's actions left bruises on her arm); *Moss v. State*, No. 05-01-00106-CR, 2002 Tex. App. LEXIS 1112, at *2-3, *6-8 (Tex. App.—Dallas Feb. 13, 2002, pet. ref'd) (not designated for publication) (concluding that trier-of-fact could have reasonably found that defendant intentionally or knowingly caused bodily injury to complainant when he grabbed her purse, struggled with her, pushed her, and wrestled purse away).

For all these reasons, we conclude that the evidence is legally sufficient to support Thompson's conviction for burglary and overrule his issue on appeal.

## CONCLUSION

Having overruled Thompson's sole issue on appeal, we affirm the district court's judgment of conviction.

 

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Bourland

Affirmed

Filed: October 21, 2015

Do Not Publish